IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS MAGNUM, et al. | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ARCHDIOCESE OF PHILADELPHIA, et al., | : | NO. 06-CV-2589 |
| Defendants. | : | |

MEMORANDUM

Davis, J.                                                          November 17, 2006

Presently before the Court is Defendants' Motion to Dismiss (Doc. No. 4), Plaintiffs'

Response in Opposition (Doc. No. 7) and Defendants' Reply thereto (Doc. No. 12).  Upon

careful consideration of all the pleadings submitted by Plaintiffs, and after hearing oral argument

on the matter on September 18, 2006, for the reasons set forth below, Defendants' Motion is

GRANTED.

I.       FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 15, 2006, twelve individuals, Thomas Magnum, Willie Magnum, James Money,

David Porter, Walt Daly, Mary Logan, Alfred Roberts, Nicholas Siravo, Bill Henis, Joan

McCrane, John Quinn and James Spoerl (collectively "Plaintiffs"), instituted the instant class-

action civil RICO action against the Archdiocese of Philadelphia and Justin Rigali, Anthony

Bevilacqua and the Estate of John Krol, three individual Cardinals (collectively "Defendants").

The substance of Plaintiffs' claims are that Defendants collectively engaged in a large-scale

cover-up of a pattern of child abuse perpetrated by individual priests of the Philadelphia

Archdiocese against numerous minor children.  Plaintiffs are adults, but were minor children at

1

the time they were allegedly abused.  The earliest instance of abuse to a named plaintiff occurred

in 1955, the latest of which in 1985.  Plaintiffs base much of their allegations on a grand jury

investigation of the Philadelphia Archdiocese conducted by the Office of the District Attorney of

Philadelphia, an investigation which culminated in a 400-plus page report ("Grand Jury Report")

detailing the Grand Jury's factual findings with regard to the allegations of sexual abuse and

cover-up.  The alleged acts of sexual abuse ranged from inappropriate fondling to harrowing

instances of forcible oral, anal or vaginal rape of minor children committed by priests.  Plaintiffs

claim there are up to 500 members of the plaintiff class and approximately sixty-three priests

who are known to have engaged in the sexual molestation of children.  Plaintiffs allege that the

sexual abuse of minor children in the Philadelphia Archdiocese began in 1940, but that the cover-

up has continued until at least 2002.  In particular, Plaintiffs claim that high level Archdiocese

officials, including the named Cardinal defendants, when confronted with complaints and

evidence of abuse, simply ignored the allegations and allowed or even in some instances

encouraged the suspected priests to continue working in the parishes, knowingly and recklessly

exposing them to more vulnerable children.  In other cases, Plaintiffs allege that Defendants

coerced and improperly influenced complainants to keep quiet, transferred priests with known

and unresolved allegations of abuse to different parishes so as to "hide" them, reprimanded or

sanctioned internal complainants, or feigned internal investigations in order to prevent

complainants from going to the authorities.

Based on these allegations, Plaintiffs assert four causes of action: (1) a 18 U.S.C.

§ 1964(c) (civil RICO) claim based on a violation of 18 U.S.C. § 1962(c); (2) a civil RICO claim

predicated on a violation of § 1962(d) (RICO conspiracy); (3) a claim of conspiracy to deprive of

civil rights (42 U.S.C. § 1985(2) and (3)); and (4) a claim of knowing neglect to prevent 42

U.S.C. § 1985 violations (42 U.S.C. § 1986).

On July 17, 2006, Defendants moved to dismiss Plaintiffs' Complaint in its entirety for

failing to state a claim and to stay class consideration until the resolution of the Motion to

Dismiss.  The Court granted the stay on July 28, 2006.  Subsequently, Plaintiffs responded in

opposition to the Motion to Dismiss and Defendants replied.  The Court heard oral arguments on

September 18, 2006.

II.    LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

tests the legal sufficiency of the complaint.  See Markowitz v. Ne. Land Co., 906 F.2d 100, 103

(3d Cir. 1990); Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987).  Dismissal for failure to state

a claim is appropriate when it clearly appears that the plaintiff can prove no set of facts in support

of the claim which would entitle him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957);

Robb v. City of Phila., 733 F.2d 286. 290 (3d Cir. 1984).  In deciding a motion to dismiss

pursuant to Rule 12(b)(6), all facts alleged in the complaint must be accepted as true.  Malia v.

Gen. Elec. Co., 23 F.3d 828, 830 (3d Cir. 1994).  A court may also consider any document

appended to and referenced in the complaint on which plaintiff's claim is predicated.[1]  See Fed.

R. Civ. P. 10(c); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1426 (3d Cir. 1997); In re

Westinghouse Sec. Litig., 90 F.3d 696, 707 (3d Cir. 1996).  A court, however, need not credit

conclusory allegations or legal conclusions in deciding a motion to dismiss.  See Gen. Motors

---

[1]  In this case, because much of Plaintiffs' Complaint is based on the Grand Jury Report, this Court will also consider the Report in evaluating Defendants' Motion to Dismiss.

Corp. v. New A.C. Chevrolet, Inc., 263 F.3d 296, 333 (3d Cir. 2001); Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).  A claim may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought.  See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179 (3d Cir. 1988).

III.    DISCUSSION

     A.    Civil RICO Based on Violation of 18 U.S.C. § 1962(c) (18 U.S.C. § 1964(c))

The civil RICO statute creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C. § 1964(c). Section 1962, in relevant part, provides:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, *inter alia*, a number of crimes such as kidnapping, extortion and bribery punishable under state law by a term of imprisonment in excess of one year, as well as numerous federal crimes such as obstruction of justice and mail and wire fraud.

In order to pursue a civil RICO claim, plaintiff must first allege (1) that he suffered an injury to his "business or property" (2) proximately caused by defendant's RICO violation.  18 U.S.C. § 1964(c); Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992) (RICO violation must not only be "but for" cause but also proximate cause of plaintiff's injury).  In general, these

4

civil RICO "standing" requirements are viewed as questions regarding the adequacy of the pleadings, rather than as questions of subject matter jurisdiction.  Anderson v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005) (citing Maio v. Aetna, Inc., 221 F.3d 472, 482 n.7 (3d Cir. 2000)).

      1.      Injury to "Business or Property"

Plaintiffs allege three types of RICO injuries as a result of Defendants' cover-up:  (1) severe emotional distress as a result of sexual abuse, resulting in loss of earnings and decreased earnings capacities; (2) out of pocket medical and psychological treatment expenses; and (3) loss of the ability to pursue personal injury claims as a result of the running of the statute of limitations.[2]  Compl. ¶ 116-17.

      a.      Personal Injuries

The Third Circuit has interpreted the term injury to "business or property" in § 1964(c) to exclude personal injuries and the economic losses derived therefrom.  Genty v. Resolution Trust Corp., 937 F.2d 899, 918 (3d Cir. 1991) (emotional distress and medical expenses arising from

---

[2]  In particular, the Complaint states:

116.    Plaintiffs have been injured in their business and/or property by reason of their inability to pursue claims for monetary damages against the Defendants for personal injuries sustained as a result of the above conduct due to the Defendants' assertion of a defense based on the statute of limitations.  The fraudulent racketeering activity set forth above was conducted for the purpose of avoiding such civil liability and in order to deny the Plaintiffs said monetary damages which they were otherwise lawfully entitled to.

117.    Plaintiffs have been and continue to be injured in their business and/or property by reason of Defendants' violations of 18 U.S.C. § 1962 et seq.  Plaintiffs suffered severe emotional and psychological stress and illness as a result of the sexual abuse, which prevented them from performing to their full capacity as productive, working adults, thus causing them loss of earnings and earning capacity.  Plaintiffs also have suffered and will continue to suffer out-of-pocket expenses relating to medical and psychological treatment, therapy and counseling necessitated by the acts of abuse.

Compl. ¶¶ 116-17.

alleged exposure to toxic waste do not confer RICO standing); Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1169 (3d Cir. 1987) (affirming dismissal for failure to state RICO claim where only mental distress was alleged).  Additionally, to survive a motion to dismiss, Plaintiffs must plead an actual and concrete monetary loss and not merely a loss to "valuable intangible property interests."  Maio, 221 F.3d at 483.  Therefore, at the outset, it is clear that Plaintiffs' claims of emotional distress, loss of earnings,[3] and decreased earnings capacities are insufficient to support a civil RICO action.

    In the leading Third Circuit case on this issue, a group of individuals purchased homes only to later discover that their homes were located near a municipal landfill owned by the local township.  Genty, 937 F.2d at 904.  The homeowners brought a civil RICO claim against the developer, mortgage lender, township and township officials, alleging defendants failed to warn them of the known dangers associated with living near the allegedly toxic landfill, and fraudulently assured some plaintiffs that the landfill posed no serious harm.  Id.  In addition to alleging economic injury resulting from decreased property values, plaintiffs claimed personal injuries, including emotional distress and out-of-pocket medical expenses resulting from

---

    [3]  However, there is legal support for the idea that an alleged loss of *employment* may suffice as a RICO injury to "property."  Diaz v. Gates, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*).  The Diaz Court based its conclusion on a distinction between "the mere loss of something of value (such as wages)" and "injury to a property interest (such as the right to earn wages)."  Id. at 900 n.1.  There is also authority from the Third Circuit to this effect.  See Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1170 (3d Cir. 1989) (in the commercial context, an alleged loss of employment due to racketeering activity is injury to "business" such that resulting loss of wages, benefits and damages to reputation are compensable RICO injuries).  Regardless, such a distinction is not helpful to Plaintiffs here since they do not allege that they lost any particular employment through Defendants' conduct, only that the trauma they suffered from the alleged sexual abuse made them less productive and less successful in their careers than they otherwise would have been, resulting in reduced earnings.  See Compl. ¶ 117.

exposure to the allegedly toxic landfill.  Id. at 918.  However, the Third Circuit concluded that because "[i]n ordinary usage, 'injury to business or property' does not denote physical or emotional harm to a *person,*" the homeowners' alleged physical and emotional injuries were insufficient to support civil RICO standing.  Id. (emphasis in original).

The vast majority of circuits concur.[4]  Indeed, the Supreme Court has remarked with regard to the identical language in section 4 of the Clayton Act that the phrase "business or property" excludes personal injuries suffered.  Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (citation omitted) (dictum).  In light of the fact that the Supreme Court has repeatedly observed that Congress modeled § 1964(c) after section 4 of the Clayton Act,[5] see, e.g., Agency

---

[4]  See, e.g., Hughes v. Tobacco Inst., Inc., 278 F.3d 417, 422 (5th Cir. 2001) (personal injuries arising from allegations of tortious assault are not injuries to "business or property"); Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 954 (8th Cir. 1999) (damage to reputation is personal injury not cognizable under RICO); Bast v. Cohen, Dunn & Sinclair, PC, 59 F.3d 492, 495 (4th Cir. 1995) (extreme mental anguish insufficient to confer RICO standing); Oscar v. Univ. Students Co-operative Ass'n, 965 F.2d 783 (9th Cir. 1992) (en banc) (personal discomfort and annoyance not sufficient to state RICO cause of action); Doe v. Roe, 958 F.2d 763, 767-68 (7th Cir. 1992) (mental anguish and pain and suffering are not cognizable RICO injuries to "business or property"); Grogan v. Platt, 835 F.2d 844, 846 (11th Cir. 1988) (loss of income based on wrongful death action is not injury to "business or property" despite its economic nature); Drake v. B.F. Goodrich Co., 782 F.2d 638, 644 (6th Cir. 1986) (wrongful death and personal injury from exposure to toxic chemicals did not satisfy § 1964(c)'s injury to "business or property" requirement); Bankers Trust Co. v. Rhoades, 741 F.2d 511, 515 (2d Cir. 1984) ("a person physically injured in a fire whose origin is arson is not given a right to recover for his personal injuries; damage to his business or his building is the type of injury for which § 1964(c) permits suit") (dictum), vacated on other grounds, 473 U.S. 922 (1985); see also Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 100-02 (D.D.C. 2003) (agreeing with the "overwhelming" authority that RICO precludes personal injuries and pointing out dicta in prior D.C. Circuit case suggesting the Circuit will follow the other courts when it squarely addresses the issue).

[5]  Section 4 of the Clayton Act provides, in relevant part: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15(a).

Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 150-51 (1987), many circuits have

relied on the aforementioned dictum in Reiter to bolster their conclusions that personal injuries

are not injuries to "business or property" under § 1964(c).  See, e.g., Genty, 937 F.2d at 918

(citing Reiter); Grogan, 835 F.2d at 847 (same).

Given the overwhelming weight of legal authority on this issue, the Court is compelled to

conclude that Plaintiffs' alleged emotional distress, loss of earnings and decreased earnings

capacity are personal injuries insufficient to confer RICO standing.

> b.    Out-of-pocket expenses

Plaintiffs' alleged out-of-pocket medical and psychological treatment expenses also are

insufficient to support a RICO claim.  While such expenses do represent concrete financial

losses, they nevertheless clearly derive from the Plaintiffs' personal injury claim of emotional

distress.  Compl. ¶ 117 (Plaintiffs' medical and psychological treatment was "necessitated by the

acts of abuse").  Indeed, the identical allegation was squarely considered and rejected by the

Third Circuit.  See Genty, 937 F.2d at 918 (medical expenses incurred as a result of exposure to

allegedly toxic waste are not RICO injuries).[6]  Furthermore, even if the Court was to put aside

---

[6] One court, however, has held that for purposes of RICO standing, money is "property"
and a loss of money constitutes an injury thereto.  Blue Cross and Blue Shield of New Jersey,
Inc. v. Philip Morris, Inc., 36 F. Supp. 2d 560, 569 (E.D.N.Y. 1999).  No court has specifically
rejected this broad conception of "property," as subsequent decisions discussing Blue Cross have
focused only on the issue of proximate causation.  Nevertheless, Blue Cross has been criticized
by numerous courts.  See Int'l Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v.
Phillip Morris, Inc., 196 F.3d 818, 827 (7th Cir. 1999) (Blue Cross is "thinly disguised refusal to
accept and follow" applicable Second Circuit precedent); see also Allegheny Gen. Hosp. v.
Phillip Morris, Inc., 228 F.3d 429, 445 (3d Cir. 2000) (expressly rejecting holding in Blue Cross
on issue of proximate cause); Rhode Island Laborers' Health and Welfare Fund ex rel. Tr. v.
Phillip Morris, Inc., 99 F. Supp. 2d 174, 177-78 (D.R.I. 2000) (noting Second Circuit holding to
the contrary and refusing to follow Blue Cross).  Therefore, given the Third Circuit's decision in
Genty and the fact that the Blue Cross decision rests on tenuous legal footing, this Court declines

controlling precedent in <u>Genty</u>, as a matter of logic, it makes little sense to recognize such a pecuniary consequence as a RICO injury when the direct personal injury itself is legally insufficient.  Therefore, despite the pecuniary nature of these alleged out-of-pocket expenses, the Court finds that they are nevertheless properly understood as part of Plaintiffs' personal injury claims and thus cannot support RICO standing.  <u>Genty</u>, 937 F.2d at 918; <u>see also</u> <u>Evans v. City of Chicago</u>, 434 F.3d 916, 926-27 (7th Cir. 2006) (loss of income caused by alleged false imprisonment is pecuniary loss "derivative of personal injuries arising under tort law" and not RICO injury); <u>Grogan</u>, 835 F.2d at 846 (no recovery under RICO for "those pecuniary losses that are most properly understood as part of a personal injury claim").

   c.  Lost tort claims

   The Plaintiffs' last remaining claim of injury is that as a result of the Defendants' conspiracy and concealment of the crimes committed by priests under their supervision, Plaintiffs lost valuable legal claims that would have resulted in monetary recovery had the claims been asserted in a timely manner.  While this is a somewhat novel pleading of injury, the Court nevertheless concludes based on a review of relevant legal authority that Plaintiffs' lost tort claims are not injuries to "business or property" under § 1964(c).

   First, there is little legal support for the argument that the loss of an opportunity to recover for a tort is a cognizable RICO injury.  In fact, a similar theory of injury was rejected by a court in this district.  In <u>Mehling v. New York Life Insurance Co.</u>, individual employees brought a RICO

---

to follow <u>Blue Cross</u> insofar as it holds that all out-of-pocket monetary losses are necessarily injuries to "property" under § 1964(c).  <u>See, e.g.</u>, <u>Doe</u>, 958 F.2d at 770 ("whether [plaintiff] can show a financial loss does not, by definition, establish that she has suffered a business or property injury within the meaning of § 1964(c)").

claim against their employer, alleging that the employer engaged in a series of fraudulent investments with regard to managing the employee retirement plan.  163 F. Supp. 2d 502 (E.D. Pa. 2001).  The employee-plaintiffs there alleged a similar injury:  because of the employer's fraudulent conduct, the plaintiffs were denied the opportunity to protect their interests by seeking the help of authorities or discontinuing contributions into the allegedly fraudulent retirement plan. Id. at 507.  The Court nevertheless dismissed the complaint, finding that notwithstanding such claims, the plaintiffs failed to allege any concrete financial injury resulting from the alleged RICO violations.  Id.; see also Doe v. Roe, 958 F.2d 763, 767-70 (7th Cir. 1992) (failure to allege RICO injury where plaintiff claimed, inter alia, that defendant engaged in "campaign of intimidation" to "prevent her from seeking legal recourse which would have revealed his fraudulent activities").

Courts have held, however, in the context of business litigation that a defendant's fraudulent or obstructive conduct which causes a plaintiff to relinquish a cause of action or otherwise delays an in-progress prosecution may constitute a "business or property" injury for RICO claims.  Deck v. Engineered Laminates, 349 F.3d 1253, 1258-60 (10th Cir. 2003); Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co., 792 F.2d 341, 354-55 (3d Cir. 1986).  In Deck, the plaintiff, a former employee of the defendants, alleged that defendants fraudulently induced him to enter into a settlement agreement to release defendants from a pending lawsuit.  349 F.3d at 1258.  The agreement further required that the plaintiff cease his business insofar as it competed with the defendants' in exchange for a series of payments.  Id.  The plaintiff additionally alleged that when defendants breached the settlement agreement by failing to pay, they misrepresented to him that the corporation no longer existed in order to prevent him from suing to enforce the agreement at a time when defendants still had assets.  Id. at 1259.  In this context, the Court held

that the foregone causes of action, both related to plaintiff's business and rooted in contract, were injuries to "business or property" sufficient to establish RICO standing.  Id.  Similarly, the Court in Malley-Duff found that where the underlying cause of action arose out of the "termination of a business," plaintiff's allegations of "great expenses, delays and inconvenience" in his prosecution of the underlying lawsuit against defendant as a result of defendant's obstruction of justice was a RICO injury.  Malley-Duff, 792 F.2d at 354-55.

However, Malley-Duff and Deck are distinguishable from the case at hand since they both involved causes of action affecting business interests grounded in contract, not tort.  The causes of action in Deck and Malley-Duff related to in-progress business contract disputes while the Plaintiffs' claims here involve tort suits which were never initiated.  Plaintiffs here, unlike the plaintiffs in Malley-Duff and Deck, allege that Defendants' conduct resulted in Plaintiffs' "inability to pursue claims for monetary damages against the Defendants for personal injuries sustained."  Compl. ¶ 116.  Therefore, because the holdings in Deck and Malley-Duff arose from factual circumstances that are sufficiently distinct from those surrounding Plaintiffs' claims, this Court concludes that they do not control the outcome in this case.

Furthermore, to the extent that Plaintiffs seek to classify their unliquidated tort claims as "property" and the loss of the opportunity to assert those claims a deprivation thereof, that view is in direct conflict with Pennsylvania state law.  While RICO is a federal cause of action, numerous circuits have held that the determination of whether a particular interest is properly considered "property" for injury to "business or property" purposes is governed by state law.  Diaz, 420 F.3d at 900 (looking to state law to determine the definition of "property" for deciding whether a certain injury is one suffered to "business or property"); Doe, 958 F.2d at 768 (citing Logan v.

11

Zimmerman Brush Co., 455 U.S. 422, 430 (1982) ("The hallmark of property ... is an individual

entitlement grounded in state law ..."); Leach v. FDIC, 860 F.2d 1266, 1274 n.14 (5th Cir. 1988)

("[a]ny definition of the term 'property,' an inherently state law-related term, should look to state

law").  In this case, under Pennsylvania law, an unliquidated personal injury tort claim is

decidedly not a property right.[7]  See, e.g., Sensenig v. Pa. R.R. Co., 78 A. 91, 92 (Pa. 1910) (right

to sue for tort "does not seem to us to be a property right, capable of assignment, prior to

liquidation"); Chiropractic Nutritional Assoc., Inc. v. Empire Blue Cross & Blue Shield, 669 A.2d

975, 983 (Pa. Super. 1995) ("under Pennsylvania state law, an unliquidated personal injury tort

claim is not a property right and is not assignable"); cf. Galey v. Mellon, 33 A. 560 (Pa. 1896)

(contracts and all rights to sue thereunder are assignable).

        Moreover, even assuming, *arguendo*, that there is merit to the claim that Plaintiffs' loss of

their unliquidated tort claims are injuries to property, determining the value of that injury for

compensatory purposes would be a wholly speculative exercise.  See First Nationwide Bank v.

Gelt Funding Corp., 27 F.3d 763, 768 (2d Cir. 1994) (a cause of action does not accrue under

_____

        [7] Insofar as Plaintiffs rely on Simon v. Playboy Elsinore Associates, 1991 WL 71119
(E.D. Pa. April 29, 1991) and Hurley v. Hurley, 492 A.2d 439 (Pa. Super. Ct. 1985) for their
assertion to the contrary on this point, such reliance is misplaced.  The issue in Simon was
whether a *settled* tort claim was property *subject to a federal tax lien*.  Simon, 1991 WL 71119,
at *2.  In Simon, plaintiffs sued for personal injuries arising out of a slip and fall occurring in a
hotel operated by defendant.  After the defendant deposited funds with the court pursuant to a
settlement agreement, the federal government intervened to levy against the settlement proceeds
in order to satisfy the plaintiffs' outstanding tax obligations.  1991 WL 71119, at *1 (E.D. Pa.
April 29, 1991).  After citing to Hurley (the same case Plaintiffs rely on here for the opposite
proposition) for the idea that personal injury claims not reduced to judgment are not assignable
and not subject to distribution as marital property, the Simon Court concluded that different
policies were at issue in the tax context and as such, the government was entitled to levy against
the settlement proceeds of the in-progress tort claim at issue.  Id. at *2-3; see also Hurley, 492
A.2d at 441 (rights of action are not property in Pennsylvania) (citing Sensenig, 78 A. at 92).

RICO until amount of damages becomes "clear and definite").  Not surprisingly, a number of courts in similar situations have dismissed RICO claims on ripeness grounds where the value of the alleged "property" deprivation was contingent upon uncertain events, such as on plaintiff prevailing in a related lawsuit against the defendant.  See DeMauro v. DeMauro, 115 F.3d 94, 97 (1st Cir. 1997) (wife failed to adequately allege injury to property where claim was based on mere expectancy of receiving an award in pending divorce proceeding); Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990); Capasso v. CIGNA Ins. Co., 765 F.Supp. 839, 842 (S.D.N.Y. 1991) ("mere expectation of a favorable decree awarding [wife] a share of her husband's assets in the state court matrimonial action" is not a property interest under RICO).

In Lincoln House, plaintiffs alleged defendant made fraudulent asset transfers in order to avoid satisfying a potential judgment in a state contract suit pending between the same parties. 903 F.2d at 847.  However, the Eleventh Circuit dismissed the RICO action, pointing out that "the only injury alleged by Lincoln is its hypothetical inability to recover from Paul Dupre, if Lincoln obtains a judgment, in some amount, in the pending state court breach of contract action."  Id. (emphasis in original).  If Lincoln were to lose in its litigation in state court, the Court reasoned, plaintiff would have no claim of injury of any sort with which to support a RICO claim.  Id. at 848.  Similarly, the Court in Deck noted that had plaintiff's only alleged injury been "prejudice to his ability to collect damages for breach of contract" because defendants allegedly fraudulently obstructed plaintiff's suit until such a time when defendants no longer had assets with which to satisfy a potential judgment, his RICO claim would have been dismissed as unripe until the contract action had been resolved.  Deck, 349 F.3d at 1260.

This Court is persuaded that this line of reasoning leads to the conclusion that Plaintiffs

here have failed to state a viable RICO cause of action.  Plaintiffs' claim of injury is entirely

contingent on the assumption that they would have prevailed in their individual tort claims in state

court had they asserted them in a timely manner; had Plaintiffs' claims been asserted and denied

on the merits, those claims would have had no monetary value and thus cannot be "property" even

under Plaintiffs' theory.[8]  Indeed, Plaintiffs' counsel conceded at oral argument that the tort claims

at issue have been "extinguished" by Pennsylvania state courts on statute of limitations grounds.

Tr. of Or. Arg. at 13; see also Meehan v. Archdiocese of Phila., 870 A.2d 912 (Pa. Super. 2005)

(state tort actions based on similar allegations of child abuse and fraudulent concealment barred

by statute of limitations).  As such, even if the Court agreed with Plaintiffs' characterization of

their lost claims as "property," their RICO claims predicated on such an alleged injury would be

unripe, and indeed would never become ripe, for judicial resolution.  Motorola Credit Corp. v.

Uzan, 322 F.3d 130, 135 (2d Cir. 2003) (no statutory standing under RICO where underlying

claims are unripe and damages were uncertain); Bankers Trust Co. v. Rhoades, 859 F.2d 1096,

1106 (2d Cir. 1988) (dismissing civil RICO claims because alleged damages were "speculative"

and "unprovable").  Therefore, consistent with the holdings of the numerous courts that have

---

[8]  To the extent that Plaintiffs attempt to quantify their damages by relying on a report
allegedly received by the National Conference of Catholic Bishops in 1985 predicting that the
failure of the Roman Catholic Church to correct the "pervasive problem of child sexual abuse by
priests" "could result in liability for the church in excess of one billion dollars
($1,000,000,000.00) over ten years," Compl. ¶ 105, such an approach is problematic.  First, the
report's figure of "one billion dollars" is merely an estimate, and estimates necessarily involve
some degree of uncertainty and speculation.  Second, the predicted liability figure is for the
Catholic Church as a whole, whereas the only issue here relates to the liability of the Archdiocese
of Philadelphia.  Given the myriad of uncertainties that would undoubtedly be inherent in the
process, even if the $1 billion estimate is accepted at face value (which it is not), the Court
declines to engage in the entirely speculative exercise of attempting to apportion such a liability
estimate among the various Archdioceses.

already weighed in on the issue, this Court conclude that Plaintiffs' complaint must be dismissed because it fails to adequately allege an injury to "business or property" as required under § 1964(c).

        2.      Proximate cause

Even assuming, *arguendo*, that Plaintiffs properly pled an injury to "business or property," the Complaint nevertheless fails to establish that Plaintiffs' injury was suffered "by reason of" a RICO violation.  18 U.S.C. § 1964(c).  To survive a motion to dismiss, in addition to alleging an injury to "business or property," plaintiff must also plead that his injuries were proximately caused by defendant's alleged RICO pattern or acts.  Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991, 1994 (2006); Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).  In determining whether proximate cause exists, a court must ask whether the alleged injury was a direct result of the complained of conduct.  Anza, 126 S.Ct. at 1998.  The Third Circuit has developed three factors to consider in the RICO proximate cause analysis: (1) the directness of the injury; (2) the difficulty of apportioning damages among potential plaintiffs and; (3) the possibility of other plaintiffs vindicating the goals of RICO by suing directly.  Allegheny Gen. Hosp., 228 F.3d at 443 (citing Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.. 171 F.3d 912, 932 (3d Cir. 1999)).  Unlike the majority of cases where the proximate cause issue arises because the RICO action is brought by a third-party based on a subrogation theory, such is not the case here.  Thus the third factor does not apply.  As such, the Court's discussion is limited to the first and second proximate cause factors, both of which strongly counsel against a finding of proximate cause.

        a.      Directness of injury

At the outset, this Court notes Plaintiffs' emotional distress and treatment cost injuries were alleged to have resulted from the actual acts of sexual abuse, and not from the subsequent fraudulent concealment.  See Compl. ¶ 117 ("Plaintiffs suffered severe emotional and psychological stress and illness *as a result of the sexual abuse* ... Plaintiffs also have suffered and will continue to suffer out-of-pocket expenses relating to medical and psychological treatment, therapy and counseling *necessitated by the acts of abuse*") (emphasis added).  None of the Defendants, however, are alleged to have perpetrated any acts of sexual abuse.[9]  Therefore, the causation analysis with regard to these injuries must end with the conclusion that even factual causation is lacking.

With regard to loss of claims, Plaintiffs claim that their injury resulted from Defendants' extensive cover-up of the widespread sexual abuse.  Plaintiffs claim that they were unaware of the wrongfulness of the priests conduct at the time the abuse was inflicted upon them, and that they did not know of the facts giving rise to Plaintiffs' causes of action until the Grand Jury Report was released in September 2005.  Compl. ¶¶ 64, 66.  Because of Defendants' fraudulent conduct in concealing the abuse, Plaintiffs allege they were prevented from discovering their injuries in time to seek legal redress.  Id. ¶¶ 33, 116.

To establish a loss of claims, it must first be demonstrated that the claims would have been

---

[9]  Plaintiffs also allege that Defendants aided and abetted the sexual abuse of children by their acts of concealment, thereby "expanding the victim base for the pedophile priests."  While this allegation may sufficiently establish factual causation, even if Plaintiffs were able to show that they were part of this expanded victim base, proximate causation would nevertheless be attenuated, as the direct injuries would still have resulted from independent and intervening acts of the priests who actually committed the sexual abuse.  See Anderson v. Ayling, 396 F.3d 265, 271 (3d Cir. 2005) (no proximate causation where independent acts of third-parties intervened between alleged racketeering conduct and ultimate injury).

brought in the absence of Defendants' alleged wrongdoing.  However, one may imagine many

reasons why a victim of abuse may not seek legal redress for his injuries in the absence of any

cover-up or even if he knew about the cover-up.  Any number of independent forces and decisions

may have intervened between the alleged concealment and the failure of Plaintiffs to bring tort

claims against their abusers.[10]  The chain of causation here is simply too attenuated to support

RICO standing.  <u>See</u> <u>Anza</u>, 126 S.Ct. at 1997 (where plaintiff's lost sales could have resulted from

a number of factors other than defendants' alleged fraud, injury is too indirect to constitute

proximate cause in civil RICO case).

> b.     Difficulty of apportioning damages

Moreover, as extensively discussed above, ascertaining the extent of actual damages in

this case based on the loss of claims injury would be extremely difficult given the speculative

nature of the injury at issue.  Therefore, this factor also weighs heavily against a finding of

proximate cause.

> 3.     Enterprise

Even if Plaintiffs are able to establish RICO standing, the Court nevertheless has concerns

about the pleadings with regard to the "enterprise" element of RICO.  RICO makes it unlawful for

"any person" who is employed by or associated with "any enterprise" affecting interstate

---

[10]  Furthermore, Plaintiffs do not allege that any of the alleged racketeering acts were ever
done towards them, namely, that any of the priests responsible for their abuse were ever
transferred or that Plaintiffs were bribed or improperly coerced or the like based on their
complaints.  In fact, with the exception of Mr. Porter, none of the Plaintiffs allege that they ever
told any of the Defendants about their abuse.  Even in Mr. Porter's case, where he allegedly
passed a note complaining of the abuse he suffered to Cardinal Bevilacqua in 1988, some twenty-
three years after he was abused, there are no allegations that the Cardinal acted to conceal the
complaint or engaged in any acts of bribery or coercion or obstructions of justice in that instance.
Compl. ¶ 41.

commerce to "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).

Plaintiffs allege a total of eleven distinct RICO "enterprises," consisting of various permutations involving Cardinal Rigali, Cardinal Bevilacqua, the late Cardinal Krol, the Archdiocese of Philadelphia, the "pedophile priests" and the United States Bishops of the Roman Catholic Church.  See Compl. ¶¶ 85-95.  Under § 1961(4), "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  While "person" is defined broadly to include both natural persons and entities, see 18 U.S.C. § 1961(3), sections 1962(c) and (d) require that the "person" and "enterprise" be distinct from one another.  B.F. Hirsch v. Enright Ref. Co., Inc., 751 F.2d 628, 634 (3d Cir. 1984).  Where the alleged "person" is also the RICO "enterprise" through which the racketeering activity occurred, liability can only arise under § 1962(a) or (b).  Petro-Tech, Inc. v. W. Co. of N. Am., 824 F.2d 1349, 1360-61 (3d Cir. 1987).  Therefore, paragraph 93 of the Complaint, in which the Archdiocese of Philadelphia itself is alleged to be an "enterprise," fails as a matter of law.

        4.      Pattern of Racketeering Activity

Plaintiffs' allegations of "pattern" and "racketeering activity" are also problematic. Establishing a RICO "pattern" requires pleading two related predicate acts of racketeering and some threat of continuing activity.  H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989).  In addition, plaintiff must also allege that *each* individual defendant engaged in two or more predicate offenses.  Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990); Hall v. Tressic, 381 F. Supp. 2d 101, 107 (N.D.N.Y. 2005).  At the outset, the Court notes that the pleadings do not

18

support the maintenance of this current action against Cardinal Rigali at all.  Nothing in the

Complaint or the Grand Jury Report alleges any wrongdoing on the part of Cardinal Rigali.  In

fact, in Plaintiffs' own words, their current claim is "based on allegations that Defendants

continued to violate RICO until at least the year 2002."  Pl.'s Resp. Brief at 10.  However,

Cardinal Rigali was not installed as the Archbishop of Philadelphia until October 7, 2003.[11]

Throughout the Complaint, Plaintiffs consistently refer to Defendants in the collective, and

generally allege that Defendants collectively engaged in a series of racketeering acts.  As defined

in § 1961(1), "racketeering activity" includes, *inter alia*, a number of crimes punishable under

state law by a term of imprisonment in excess of one year, as well as a litany of federal crimes

such as obstruction of justice and mail and wire fraud.  18 U.S.C. § 1961(1).  In particular,

Plaintiffs allege that Defendants engaged in "acts and/or threats involving kidnapping, bribery,

extortion, and dealing in obscene matter" all of which are felonies under state law.  Compl. ¶ 114.

In addition, the Complaint claims that Defendants committed the federal offenses of "mail and/or

wire fraud, obstruction of criminal investigations, obstruction of state or local law enforcement,

tampering with a witness or victim, retaliating against a witness or victim, peonage, slavery and

---

[11]  While the Complaint does not provide the dates of Cardinal Rigali's tenure, according
to his biography as published on the Archdiocese of Philadelphia website, the Cardinal was
appointed as Archbishop of Philadelphia on July 15, 2003 and was formally installed as such on
October 7, 2003.  See http://archdiocese-phl.org./rigali/biorigali.htm.  Prior to 2003, Cardinal
Rigali served as the Archbishop of St. Louis.  Id.  Because this information is a matter of public
record, and is both generally known and capable of accurate and ready determination, the Court
will take judicial notice.  See  Fed. R. Evid. 201(b) (type of facts subject to judicial notice); see
also Buck v. Hampton Township School Dist., 452 F.3d 256, 260 (3d Cir. 2006) (courts may
consider items subject to judicial notice and matters of public record, in addition to the pleadings,
when evaluating motion to dismiss).

trafficking in persons and sexual exploitation of children."[12]  Id.

Notwithstanding this long list of alleged criminal conduct, however, the Complaint fails to provide sufficient facts to support the allegations.  The only individual Defendant specifically mentioned by name in the Complaint is Cardinal Belivacqua.  Even then, the Complaint only alleges that Cardinal Belivacqua made misrepresentations to the Grand Jury in 2002 regarding the extent of the cover-up, and that in 1988, Plaintiff Mr. Porter allegedly notified Cardinal Belivacqua of his abuse.[13]  Id. at ¶ 115, 41. Looking to the Grand Jury Report, only Cardinal Belivacqua and Cardinal Krol are mentioned by name, and where they are so referenced, they are generally alleged to have transferred and/or accepted certain priests suspected of abuse and in some instances persuaded parents not to go to the authorities with abuse complaints.  The allegations are conclusory and generalized, and often do not even contain the dates the acts were alleged to have occurred.

With regard to the alleged state crimes, the Complaint is devoid of any facts in support of the essential elements of the kidnapping, bribery, extortion and dealing in obscene matter charges.  Indeed, to the extent that Plaintiffs seek to establish criminal liability based on state law on the part of the named Defendants, their own Grand Jury Report undercuts their attempt.  The Report contains a detailed analysis of the likelihood of success in prosecuting the leaders of the

---

[12]  The Complaint does not specify where in Title 18 the alleged offenses are found. However, it appears that Plaintiffs have used the general names of the offenses as they are found in the definition of "racketeering activity" 18 U.S.C. § 1961(1).  Therefore, this Court will analyze the sufficiency of Plaintiffs' allegations by reference to § 1961(1) and the offenses provided therein.

[13]  With regard to Mr. Porter, the Complaint only alleges that although his note to Cardinal Belivacqua contained his contact information, he was never contacted.  Compl. ¶ 41.

Archdiocese for their roles in the sex abuse and the cover-up.  <u>See</u> Grand Jury Report, p. 64-68. The Grand Jury considered various state criminal statutes, including accomplice liability for sexual abuse, reckless endangerment and obstructions of justice, but ultimately concluded the conduct of the high level Archdiocese officials did not rise to a level such that they could be prosecuted under existing Pennsylvania criminal law.  <u>Id.</u> at 64.

Furthermore, as to the federal offenses, many of those alleged by Plaintiffs to have been committed by Defendants are wholly irrelevant to the facts of this case.  For instance, the "obstruction of state or local law enforcement" offense pled by Plaintiffs only criminalizes certain conduct done "with the intent to facilitate an illegal gambling business."  18 U.S.C. § 1511(a). Likewise, the offenses of "peonage, slavery and trafficking in persons" require the actual interstate or international transportation of persons, <u>see</u> 18 U.S.C. §§ 1581-90, or intent to coerce or force the minor to engage in a "commercial sex act," 18 U.S.C. § 1591, or involve the withholding of an individual's identification or immigration documents, 18 U.S.C. § 1592.  Furthermore, the "sexual exploitation of children" offense criminalizes conduct relating to the creation of child pornography.  18 U.S.C. §§ 2251, 2251A, 2252, 2260.  The "obstruction of criminal investigations" charge also fails because it only relates to obstructive conduct relating to a *federal* criminal investigations made to a "criminal investigator."  18 U.S.C. § 1510.  Additionally, even if the tampering and retaliation statutes are applicable to this case, Plaintiffs have nevertheless failed to allege any specific acts so as to establish the essential elements of those offenses.  <u>See</u> 18 U.S.C. §§ 1512, 1513.

Plaintiffs also allege that Defendants engaged in wire and mail fraud, based on Defendants' acts of transferring priests to various parishes and of soliciting contributions from

parishioners, both of which were accomplished through interstate letters and telephone calls. Compl. ¶¶ 103, 113.  The federal mail and wire fraud statutes criminalizes the use of the mails or interstate wires for purposes of carrying out any "scheme or artifice to defraud."  18 U.S.C. §§ 1341, 1343.  However, to the extent that Plaintiffs seek to base their RICO claim on predicate acts of mail and wire fraud, they must comply with Federal Rule of Civil Procedure 9(b), which requires that fraud allegations be pled with specificity.  Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004); Fed. R. Civ. P. 9(b) ("[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity").  Plaintiffs must plead with particularity the circumstances of the alleged fraud so as to provide defendants with notice of the precise misconduct with which they are charged.  Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984).  Plaintiffs can satisfy this heightened pleading requirement by pleading the "date, place or time of the fraud," or must otherwise somehow inject some level of "precision" or "substantiation" into their allegations.  Lum, 361 F.3d at 224. Plaintiffs must, at the very least, allege "who made a misrepresentation to whom and the general content of the misrepresentation."  Id.

Plaintiffs' Complaint fails to plead the mail and wire fraud allegations with any level of particularity.  With regard to transferring the priests, neither the Complaint nor the Grand Jury Report provides sufficient details of the acts alleged to have been wrongful so as to satisfy Rule 9(b).  Plaintiffs do not give the dates and times of the transfers, where the priests were transferred to and from, exactly how the transfers were facilitated (whether through letters or phone calls), or what misrepresentations, if any, were made in carrying out the transfers.  Similarly, the allegations regarding the contribution solicitations are even more vague and conclusory, stating only that

22

Defendants "fraudulently misrepresented facts of known sexual misconduct to parishioners ... for the economic purpose of avoiding civil liability while increasing or maintaining the charitable contributions ... Upon information and belief, much, if not all, of the solicitations for contributions were effectuated by using the United States Postal Service or interstate wire service."  Compl. ¶ 113.  Such allegations plainly fail to comply with Rule 9(b)'s pleading requirements.  See Lum, 361 F.3d at 227 (district court properly dismissed complaint for failing to plead mail and wire fraud with requisite specificity).

In conclusion, not only do Plaintiffs fail to sufficiently allege that *each* Defendant engaged in two or more predicate acts as is necessary to establish a RICO "pattern" under § 1961(5), the Court is not convinced that Plaintiffs have even sufficiently pled the existence of *any* "racketeering activity."  Therefore, even if Plaintiffs had established standing for RICO purposes, the Complaint must still be dismissed for failing to adequately plead a RICO "pattern of racketeering activity."

### 5.    Statute of Limitations

Plaintiffs claim that Defendants' fraudulent concealment continued until at least 2002, and as a result of the cover-up, Plaintiffs only discovered their injuries when the Grand Jury report documenting the widespread cover-up and sex abuse in the Philadelphia Archdiocese was released in September 2005.  While the statute of limitations may be one of the most glaring legal issues in this case, the Court concludes that this particular question is not properly considered at the Rule 12(b)(6) stage.  Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (may only dismiss for Rule 12(b)(6) on statute of limitation grounds when the bar is "apparent on the face of the complaint").  Given the alleged fraudulent concealment and the potential applicability of the

equitable tolling doctrine, that the four-year RICO statute of limitations bars this action is certainly not so facially apparent as to warrant its dismissal on this ground.

B.      Civil RICO Conspiracy in Violation of 18 U.S.C. § 1962(d) (18 U.S.C. § 1964(c))

Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Plaintiffs' RICO conspiracy claim cannot survive if the Complaint has not sufficiently pled a substantive RICO claim based on § 1962(c). Lum, 361 F.3d at 227 n.5 (district court properly dismissed § 1962(d) claim where plaintiffs failed to adequately plead a substantive RICO claim under § 1962(c)); Lightning Tube, Inc. v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993) ("[a]ny claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 must necessarily fail if the substantive claims are themselves deficient"). Since this Court finds Plaintiffs have failed to adequately allege a claim under § 1962(c), see supra Section III.A, it follows that Plaintiffs' § 1962(d) claim must be dismissed as well.

C.      Conspiracy For Deprivation of Civil Rights (42 U.S.C. § 1985(2) and (3))

Plaintiffs allege Defendants conspired to impede and obstruct justice in violation of 42 U.S.C. § 1985(2)[14] and conspired to deprive Plaintiffs of equal protection of the laws in violation

---

[14]   Section 1985(2) contains two distinct clauses. The first deals with conspiracies to obstruct justice in federal courts, and the second prohibits conspiracies to obstruct justice in the states. See Kush v. Rutledge, 460 U.S. 719, 724-25 (1983). Plaintiffs have only alleged a violation of the second clause, and as such all discussion here only addresses that portion of the statute. The relevant part of § 1985(2) provides:

> If two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the

of 42 U.S.C. § 1985(3).[15]  However, based on settled constitutional principles, Plaintiffs have

failed to state a claim under either § 1985 provision.

Both § 1985(2) and (3) reach purely private conspiracies.  Brawer v. Horowitz, 535 F.2d

830, 839 (3d Cir. 1976); Griffin v. Breckenridge, 403 U.S. 88, 96-101 (1971).  The Supreme

Court has interpreted § 1985(3) and the second clause of § 1985(2) similarly, finding that each

contains language "requiring that the conspirators' actions be motivated by an intent to deprive

their victims of the equal protection of the laws."[16]  Kush, 460 U.S. at 725.  Furthermore, it is a

settled constitutional interpretation that "intent to deprive of *equal* protection, or *equal* privileges

and immunities, means that there must be some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind the conspirators' action."  Id. at 726 (emphasis in

original); Bray, 506 U.S. at 272 n.4 (applying Equal Protection jurisprudence to § 1985(3) to

_____

conspirators.

[15]  Section 1985(3) provides:

> If two or more persons in any State or Territory conspire or go in disguise on the
> highway or on the premises of another, for the purpose of depriving, either
> directly or indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; or for the purpose of
> preventing or hindering the constituted authorities of any State or Territory from
> giving or securing to all persons within such a State or Territory the equal
> protection of the laws ... the party so injured or deprived may have an action for
> the recovery of damages occasioned by such injury or deprivation, against any one
> or more of the conspirators.

[16]  This Court rejects Plaintiffs' assertion that the second clause of § 1985(3) – the
"prevention clause" – is not subject to the class-based animus requirement notwithstanding its
"equal protection" language.  Pl.'s Resp. Brief at 22 (citing Bray v. Alexandria Women's Health
Clinic, 506 U.S. 263, 302-03 (1993) (Souter, J., concurring)).  This argument made by Justice
Souter in his Bray concurrence was also made by Justice Stevens in dissent, but the argument
was nevertheless discounted and essentially rejected by the majority.  See Bray, 506 U.S. at 282
n.13 (straightforward application of Kush to the language of § 1985(3)'s "prevention clause"
results in contrary conclusion to that reached by Justice Stevens).

require class-based discriminatory animus); <u>Brawer</u>, 535 F.2d at 840 (dismissing complaint for

failing to state claim under second half of § 1985(2) where there was no allegation of class-based,

invidiously discriminatory animus).[17]  The existence of such a discriminatory animus is not

presumed and intent to discriminate must be clearly demonstrated.  <u>Palace v. Deaver</u>, 838 F. Supp.

1016, 1020 (E.D. Pa. 1993).  Moreover, section 1985(3) only applies to "such conspiracies as are

aimed at interfering with rights ... protected against private, as well as official encroachment."

<u>Bray</u>, 506 U.S. at 278 (internal quotations omitted) (quoting <u>Carpenters v. Scott</u>, 463 U.S. 825,

833 (1983)).

Therefore, in order to recover under § 1985(3), plaintiff must plead (1) some class-based

discriminatory animus, (2) intent to deprive a right guaranteed against *private* impairment, and (3)

that the right was intentionally targeted for impairment.  <u>Brown v. Phillip Morris Inc.</u>, 250 F.3d

789, 805 (3d Cir. 2001).  However, "in the context of actions brought against private conspirators,

the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to

be free from involuntary servitude and the right to interstate travel."  <u>Id.</u>; <u>Bray</u>, 506 U.S. at 278.

Plaintiffs' Complaint fails on all prongs.  First, Plaintiffs allege that they were members of

a protected class because they were "at all relevant times minor children" or "members of the

--------------------------------------------------------------------------------

[17]  To the extent Plaintiffs rely on <u>Britt v. Suckle</u> to claim § 1985(2) does not require a
class-based animus, that reliance is misplaced.  453 F. Supp. 987, 997 (E.D. Tex. 1978).  First,
the <u>Britt</u> decision is in direct conflict with Third Circuit precedent in <u>Brawer</u>.  <u>Id.</u> at 995 (noting
Third Circuit holding that § 1985(2) requires a class-based animus but declining to follow it).
Furthermore, as the Supreme Court subsequently noted in <u>Kush,</u> the same "equal protection"
language is found in § 1985(3) and in the second clause of § 1985(2), language which was
interpreted in <u>Griffin</u> to require some racial or other class-based discriminatory animus.  <u>See</u>
<u>Kush</u>, 460 U.S. at 725; <u>Bray</u>, 506 U.S. at 282 n.13 (<u>Griffin</u>'s animus requirement derived from an
interpretation of the "equal protection" language in § 1985(3)).  As such, this Court has serious
concerns about whether <u>Britt</u> is good law, especially after <u>Kush</u> and <u>Bray</u>.

Roman Catholic Church."  Compl. ¶¶ 125-26.  The Supreme Court has clarified that in order to

constitute a "class of persons" for § 1985(3), the persons must be "more than a group of

individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors."

Bray, 506 U.S. at 269.  The group must consist of "victims of historically pervasive

discrimination" or those with "immutable characteristics."  Pearson v. Miller, 988 F. Supp. 848,

859 (M.D. Pa. 1997) (42 U.S.C. § 1985(3) case) (quoting Carchman v. Korman Corp., 594 F.2d

354, 357 (3d Cir.), cert. denied, 444 U.S. 898 (1979)).  Examples of such recognized groups

include women and the mentally disabled.  Lyes v. City of Riviera Beach, 126 F.3d 1380, 1389-90

n.19 (11th Cir. 1997) (women as protected class); Bedford v. Southeastern Pa. Transp. Auth., 867

F. Supp. 288, 294 (E.D. Pa. 1994) (because "[s]ex is an immutable characteristic resulting from a

fortuity of birth and women historically have been victims of discrimination," section 1985(3)

encompasses gender-based animus); Lake v. Arnold, 112 F.3d 682, 686 (3d Cir. 1997) (extending

class protection in § 1985(3) case to mentally handicapped).  However, minor children have not

been held to be a protected class in the context of § 1985(3) actions.  Pearson, 988 F. Supp. at

859; Tazioly v. City of Phila., 1998 WL 633747, *16 (E.D. Pa. Sept. 10, 1998) (citing Pearson).

On the other hand, there is conflicting authority as to whether the reach of § 1985(3) extends to

include conspiracies motivated by religious animus.  Compare Word of Faith World Outreach

Center Church, Inc. v. Sawyer, 90 F.3d 118, 124 (5th Cir. 1996) (religious animus not covered by

§ 1985(3)) with Ward v. Connor, 657 F.2d 45, 48 (4th Cir. 1981) (religious discrimination falls

within ambit of § 1985).  While the Third Circuit has not explicitly addressed this issue, its

dictum suggests that religion-based animus would be actionable under § 1985(3).  See Wilson v.

Rackmill, 878 F.2d 772, 775 (3d Cir. 1989) (since complaint alleged defendants "acted against

[plaintiff] out of racial and religious animus," "[plaintiff] may have stated a claim for conspiracy under § 1985").

However, even if the Court assumes, *arguendo*, that religious groups or minor children are protected classes for § 1985(3) purposes, Plaintiffs nevertheless fail to allege that Defendants' actions were done *by reason of* any discriminatory animus against members of either of those groups.[18]  Rather, Plaintiffs allege only that Defendants preyed on the vulnerabilities of Plaintiffs as members of those groups in carrying out their acts.  See Compl. ¶ 125 (Defendants "used ... Plaintiffs' status as minor children, including their obedience to adult authority and their susceptibility to the notion of the sanctity of the pedophile priests" to perpetrate their concealment), ¶ 126 (Defendants "used ... Plaintiffs' religious beliefs, including their belief in God and the sanctity of the pedophile priests" to carry out their wrongful acts).  Such actions, while certainly morally deplorable, nevertheless do not rise to allegations of any discriminatory animus.

In addition, Plaintiffs do not allege the violation of any right recognized to be protected under § 1985(3) against private impairment, nor do they allege any state action.  Plaintiffs only claim violations of their "substantive due process rights to bodily integrity" and "substantive rights created under state law designed to protect minor children."  Compl. ¶¶ 142, 143.  In other parts of the Complaint, Plaintiffs plead another deprivation: that of Plaintiffs' "ability to seek legal redress."  Id. ¶¶ 127, 140 (Defendants "obstructed the prosecution of Plaintiffs' causes of action against them").  However, there is no allegation that Defendants' conduct impinged on

---

[18]   Indeed, Defendants themselves are members of the same religious group as Plaintiffs – the Roman Catholics.

28

Plaintiffs' rights to interstate travel and to be free from involuntary servitude, the only two rights recognized under § 1985 to be protected from private encroachment.  Therefore, the Complaint fails to state a § 1985 cause of action.

      D.      Knowing Neglect to Prevent 42 U.S.C. § 1985 Violation (42 U.S.C. § 1986)

      A cognizable 42 U.S.C. § 1985 claim is a prerequisite to stating a claim under § 1986. <u>Brawer</u>, 535 F.2d at 841 (dismissing a § 1986 claim because plaintiffs failed to state a claim under § 1985); <u>Pearson</u>, 988 F. Supp. at 859 (citing <u>Robison v. Canterbury Vill., Inc.</u>, 848 F.2d 424, 431 n.10 (3d Cir. 1988)).  Since Plaintiffs have not properly pled a § 1985 violation under any viable legal theory, their claim under § 1986 must be dismissed as well.

IV.    CONCLUSION

      For the foregoing reasons, Defendants' Motion to Dismiss must be granted.  In reaching this decision, the Court is fully cognizant of the serious nature of the underlying allegations at issue in this case.  However, it is the duty of the judiciary to apply the law as it has been written, and as such this Court cannot force a moral wrong into a legal mold where it clearly does not fit. The remedy lies with Congress, not with the courts.  An appropriate Order follows.